**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**BILLY CAROL ANDERSON, SR.**                                        **PETITIONER**

**v.**                                        **Civil No. 1:21cv150-HSO-MTP**

**BURL CAIN**                                        **RESPONDENT**

**MEMORANDUM OPINION AND ORDER OVERRULING PETITIONER
BILLY CAROL ANDERSON, SR.'S OBJECTION [18] TO THE REPORT AND
RECOMMENDATIONS [16] OF THE UNITED STATES MAGISTRATE
JUDGE; ADOPTING THE REPORT AND RECOMMENDATIONS [16]; AND
DISMISSING PETITIONER BILLY CAROL ANDERSON, SR.'S PETITION
[1] UNDER 28 U.S.C § 2254 FOR WRIT OF HABEAS CORPUS BY A
PERSON IN STATE CUSTODY**

BEFORE THE COURT is the Report and Recommendations [16] of United

States Magistrate Judge Michael T. Parker, which recommends dismissing

Petitioner Billy Carol Anderson, Sr.'s Petition [1] under 28 U.S.C. § 2254 for Writ of

Habeas Corpus by a Person in State Custody. Anderson has filed an Objection [18]

to the Report and Recommendations [16]. After due consideration of the Report and

Recommendations [16], the record, the parties' filings, and relevant legal authority,

the Court finds that Anderson's Objection [18] should be overruled, that the Report

and Recommendations [16] should be adopted as the finding of the Court, and that

Anderson's Petition [1] under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a

Person in State Custody should be dismissed with prejudice.

I. <u>BACKGROUND</u>

On June 26, 2015, a jury in the Circuit Court of George County, Mississippi, found Petitioner Billy Carol Anderson, Sr. ("Petitioner" or "Anderson") guilty of seven counts of touching a child for lustful purposes in violation of Mississippi Code Annotated § 97-5-23. State Ct. R. ("SCR") [12-21] at 47, 49-50. Anderson was sentenced to the statutory maximum of fifteen years' imprisonment on each count to run consecutively. *Id.* at 53.

In his Petition [1] in this Court, Anderson raises six claims of error from his state court proceedings: (1) his trial counsel was ineffective by failing to investigate and present evidence of his blackmail defense, Mem. [3] at 2-13; (2) his first appellate counsel was ineffective by failing to file an appeal, *id.* at 13-17, and his second appellate counsel was ineffective by filing a *Lindsey* brief[1] stating that she found no non-frivolous grounds for appeal, *id.* at 17-21; (3) the Mississippi Supreme Court violated his due process rights by denying his petitions without a written opinion, *id.* at 21-26; (4) the oath was not administered to the jury, *id.* at 26-29; (5) the trial court abused its discretion by not sua sponte declaring a mistrial after witnesses apparently violated the witness sequestration rule, *id.* at 30-32; and (6) his sentences violate the Eighth Amendment's prohibition on cruel and unusual punishments, and in sentencing the trial court improperly considered testimony

---

[1] A *Lindsey* brief refers to a filing pursuant to the procedures set forth in *Lindsey v. State*, 939 So. 2d 743 (Miss. 2005), which "govern[s] cases where appellate counsel represents an indigent criminal defendant and does not believe his or her client's case presents any arguable issues on appeal." *Thomas v. State*, 247 So. 3d 1252, 1256 (Miss. 2018) (quotation omitted).

regarding other sexual crimes by Anderson for which he was never convicted, *id.* at 32-35.

A.     Factual and procedural history

1.     Anderson's jury trial

In August 2012, Anderson's fifteen-year-old stepdaughter, Susan,[2] informed her mother, Caroline, that Anderson had been improperly touching her since she was twelve. *Anderson v. State*, 293 So. 3d 279, 283 (Miss. Ct. App. 2019); SCR [12-18] at 119-23. Susan testified that he would "wrestl[e]" with her and touch her vagina with his fingers over her clothes "all the time." SCR [12-18] at 120-21, 126-27, 146-47. She further explained that "[h]e would try to forcibly go into [her] body with his fingers." *Id.* at 131.

Caroline testified at trial that she did not initially contact the police, but following various inappropriate sexual comments made by Anderson about Susan, she reported these incidents to the George County, Mississippi, Sheriff's Office. *Anderson*, 293 So. 3d at 283; SCR [12-19] at 42-46. Two investigators, Detective Jason Pharez ("Pharez"), who investigated Caroline's report and contacted several of Anderson's biological and adopted daughters, and a forensic interviewer, Ashley Ahern, who conducted an interview with Susan, also testified at trial. SCR [12-19] at 5-8, 70-78.

---

[2] The Mississippi Court of Appeals and the Report and Recommendations [16] used aliases for the names of Anderson's victims due to the sensitive nature of this case. *Anderson v. State*, 293 So. 3d 279, 283 & n.1 (Miss. Ct. App. 2019); R. & R. [16] at 2. The Court adopts the same aliases in this Order.

In addition, the State presented two witnesses, Anderson's adopted daughter, Ann, and his biological daughter, Sally, "to show Anderson's lustful, licentious intent and sexual motive" pursuant to *Derouen v. State of Mississippi*, 994 So. 2d 748, 754-56 (Miss. 2008). Under *Derouen*, the State could offer testimony of a sexual offense committed by the defendant, "other than the one charged, which involves a victim other than the victim of the charged offense," so long as the evidence is accompanied by a proper limiting instruction and is otherwise admissible. *Derouen*, 994 So. 2d at 756. Following a limiting instruction, both Ann and Sally testified that Anderson inappropriately touched them when they were both around Susan's age, and under similar circumstances as those described by Susan. *Anderson*, 293 So. 3d at 283-84; SCR [12-19] at 88, 93-94, 117-19, 122.

The defense presented several witnesses. First, Anderson's oldest biological daughter, Virginia, testified that Susan was disrespectful to Anderson, SCR [12-19] at 141-42, and that Ann and Sally had made false allegations against him, *id.* at 142-44. She also stated that Sally specifically threatened Anderson that if he did not "give [her] money, [she was] going to tell everybody [Anderson] touched [her] butt." *Id.* at 144. On cross-examination, Virginia acknowledged that she and another sister, Melissa, had previously told their stepmother that Anderson had sexually abused them. SCR [12-20] at 6-9. She further testified that this accusation was false and that they had made it up in hopes that their stepmother would divorce Anderson. *Id.* Another of Anderson's daughters, Carol, testified that Ann had told her that Anderson had touched her when she was thirteen or fourteen

4

years old but later recanted. *Id.* at 25-26, 48. The defense also offered testimony that Anderson, Susan, and Caroline often argued, and that Susan would curse and yell at Anderson. *Id.* at 52-55, 62-64.

Anderson testified on his own behalf. SCR [12-20] at 70-112. He stated that Susan was often "out of control," "disrespectful," and "prone to lying." *Id.* at 70-71, 75. He said that she would instigate the wrestling by "grab[bing him] around the throat and turn[ing him], the chair and all over," and that he would have to restrain her by her hands and legs in order to stop her from punching him. *Id.* at 76-78. Anderson denied ever improperly touching Susan or any of his other daughters. *Id.* at 78, 82, 89-90, 93. He asserted that Sally had fabricated her accusations because he refused to let her quit high school and refused to give her money, *id.* at 91-92, 106-07, 111, and that Susan had been upset with him, said that "[she] will get [him]," and had carried out that threat through the charges he faced, *id.* at 110-11. However, when asked directly whether he had any idea why his daughters would make up any allegations against him, Anderson twice responded "[n]o." *Id.* at 94, 109-10.

The State offered Janie, another daughter of Anderson's, as a rebuttal witness. *Id.* at 114-19. She testified that four of her sisters, including Ann and Sally, had previously told her that they had been sexually abused by Anderson. *Id.* at 114-15, 117.

The jury found Anderson guilty on all seven counts of touching a child for lustful purposes. SCR [12-21] at 47, 49-50. Following arguments by the State and

the defense, the trial court sentenced Anderson to the statutory maximum term of fifteen years of imprisonment on each count, to run consecutive to one another. *Id.* at 53.

2.   Anderson's appeal

Anderson did not file a timely notice of appeal. *Anderson*, 293 So. 3d at 285. He claims that the attorney he hired to file a direct appeal accepted payment and disappeared. Mem. [3] at 13-14. Anderson subsequently received permission to file an out-of-time appeal, and was appointed counsel to represent him. SCR [12-7] at 155. His appointed counsel ultimately filed a *Lindsey* brief stating that she found no non-frivolous grounds for appeal, and Anderson filed a pro se supplemental brief, raising seven claims of error. *Anderson*, 293 So. 3d at 285-86. Of relevance here, Anderson argued that the trial court erred by not swearing in the jury, by not ordering a mistrial due to witnesses being present in the courtroom, and by considering the allegations of the *Derouen* witnesses in sentencing. *Id.* at 286, 294-96.

The Mississippi Court of Appeals affirmed Anderson's convictions and sentences. *Id.* at 297. Regarding Anderson's claim that the jury was not sworn, the appellate court found that he "failed to provide sufficient evidence that the oath was not administered" because he relied on the "lack of the oath in the trial transcript," while the jury instructions and sentencing order both noted that the jury had been sworn. *Id.* at 294. The appellate court also determined that the trial court did not err in addressing the alleged sequestration violation, observing that the trial court

6

had admonished the attorneys to remind their witnesses not to enter the courtroom or communicate with other witnesses about the case, and that Anderson "ha[d] made no showing that he was prejudiced" by any violation of the sequestration rule or that "these actions constituted attempts to tailor these witnesses' testimony or resulted in inaccurate or false testimony." *Id.* at 295-96. Finally, the appellate court rejected Anderson's challenge to his sentences by finding that "the trial judge specifically recognized at the sentencing hearing that Anderson 'ha[d] not ever been convicted of a crime,'" that there was no evidence "that the trial judge placed improper emphasis on Ann's testimony in imposing Anderson's sentences," and that his sentences were not constitutionally disproportionate. *Id.* at 296-97.

Anderson sought further review by filing a petition for certiorari in the Mississippi Supreme Court, which denied his request. *Anderson v. Mississippi*, 291 So. 3d 1112, 1112 (Miss. 2020). He then sought leave to file a petition seeking state post-conviction relief, asserting ineffective assistance of his trial and appellate counsel and reasserting his claims about the failure to swear in the jury and to sequester the witnesses. SCR [12-2] at 21-48. The Mississippi Supreme Court denied his application on November 18, 2020. SCR [12-2] at 7.

B.    The present Petition [1]

On May 4, 2021, Anderson timely filed the present Petition [1] in this Court requesting that his convictions and sentences be vacated pursuant to 28 U.S.C. § 2254. Pet. [1]. The Petition [1] advances six claims of error: (1) ineffective assistance by Anderson's trial counsel for failing to investigate and present evidence of the

victim and her mother "blackmail[ing], fram[ing], and retaliat[ing] against Anderson" ("Ground 1"), Mem. [3] at 2-13; (2) ineffective assistance by Anderson's appellate counsel because his first appellate counsel failed to file an appeal, *id.* at 13-17, and his second appellate counsel filed a *Lindsey* brief ("Ground 2"), *id.* at 17-21; (3) a due process claim that the Mississippi Supreme Court violated Anderson's rights by denying his petitions without a written opinion ("Ground 3"), *id.* at 21-26; (4) "a fundamental miscarriage of justice" because the oath was not administered to the jury ("Ground 4"), *id.* at 26-29; (5) abuse of discretion by the trial judge by not declaring a mistrial sua sponte after witnesses violated the sequestration rule ("Ground 5"), *id.* at 30-32; and (6) a claim that Anderson's sentences constitute "cruel and unusual punishment" because the trial court improperly considered testimony regarding other sexual crimes by Anderson for which he was never convicted ("Ground 6"), *id.* at 32-35. Anderson also seeks an evidentiary hearing. Pet. [1] at 15.

In its Response [11], the State notes that Anderson has exhausted his state remedies and has presented all of his claims to the Mississippi Supreme Court, which rejected them on the merits. Resp. [11] at 12. It argues that Anderson's Petition [1] should be denied because Anderson failed to show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts. *Id.* at 13, 18-35.

C.    The Report and Recommendations [16]

The Magistrate Judge issued a Report and Recommendations [16], recommending that Anderson's Petition [1] be denied. R. & R. [16] at 1. The Magistrate Judge found that the state court did not err in finding no ineffective performance or prejudice as to Anderson's ineffective assistance of trial counsel claim, and that Anderson did not show any prejudice from the allegedly deficient performance of his appellate attorneys. *Id.* at 10-15. Regarding Anderson's claim that the Mississippi Supreme Court violated his due process rights by summarily dismissing his claims, the Magistrate Judge determined that any infirmity in the state habeas proceeding is not grounds for relief in this Court, and that Anderson was not entitled to a detailed opinion addressing his claims. *Id.* at 15-16. The Magistrate Judge next concluded that the state court did not unreasonably find that there was insufficient evidence to overcome the presumption under Mississippi law that the jury was sworn, *id.* at 16-17, and that the witness sequestration claim did not assert a constitutional violation, *id.* at 17-18. As to Anderson's sentencing claim, the Magistrate Judge determined that Anderson did not show that his sentences were grossly disproportionate to the offenses or that the trial court acted arbitrarily or capriciously in imposing them. *Id.* at 19-20. Finally, the Magistrate Judge recommended that Anderson's request for an evidentiary hearing be denied because "he has not explained how an evidentiary hearing would bring forth facts that could not have been discovered previously and which show that a constitutional error occurred." *Id.* at 20-21.

Anderson has filed an Objection [18] to the Report and Recommendations [16] which challenges only the Magistrate Judge's findings as to Grounds 1, 4, 5, and 6. *See generally* Obj. [18]. Regarding Ground 1, Anderson argues that his trial counsel only "asked a few weak questions" as to the credibility of the States' witnesses and did not address his theory of "blackmail" and "retaliation" in opening statements. *Id.* at 1-2. Next, as to Ground 4, Anderson claims that he had a constitutional right to have the jury sworn, citing to a case from the Illinois Supreme Court, and that the only evidence that an oath was administered is from "boiler-plate language" in the jury instructions. *Id.* at 2-4. With respect to Ground 5, Anderson asserts that the Magistrate Judge erred by only reviewing whether the state court unreasonably applied federal law and not whether it was a constitutional violation that the witnesses were communicating during trial, and that his trial was "fundamentally unfair" due to this lack of sequestration. *Id.* at 4-5. Finally, as to Ground 6, Anderson argues that he is raising his sentencing challenge under the Eighth Amendment's "cruel and unusual clause," and is not claiming that it was disproportionate. *Id.* at 5-6.

## II. <u>DISCUSSION</u>

A.   <u>Standard of review</u>

1.   <u>28 U.S.C. § 636(b)(1)(B)</u>

Where a party objects to a magistrate judge's proposed findings and recommendations, the Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to

which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3);

*Longmire v. Guste*, 921 F.2d 620, 623 (5th Cir. 1991) (holding that a party filing

written objections is "entitled to a de novo review by an Article III judge as to those

issues to which an objection is made"). However, a court is not required to make

new findings of fact in order to conduct a de novo review, *Warren v. Miles*, 230 F.3d

688, 694 (5th Cir. 2000), nor is it required to "reiterate the findings and conclusions

of the magistrate judge," *Koetting v. Thompson,* 995 F.2d 37, 40 (5th Cir. 1993). The

Court also need not consider "[f]rivolous, conclusive or general objections." *Battle v.*

*U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). Where there has been no

objection to a magistrate judge's ruling, a clearly erroneous, abuse of discretion, and

contrary to law standard applies. *United States v. Wilson*, 864 F.2d 1219, 1221 (5th

Cir. 1989). After conducting the appropriate review, the district judge "may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge [and] may also receive further evidence or recommit the matter to

the magistrate judge with instructions." 28 U.S.C. § 636(b)(1).

As noted previously, Anderson has not raised any specific objections to the

Report and Recommendations' [16] conclusions regarding Grounds 2 and 3 or his

request for an evidentiary hearing. The Court has conducted the necessary review

and finds that these portions of the Report and Recommendations [16] to which

Anderson does not object are neither clearly erroneous nor contrary to law. The

Court will adopt the Magistrate Judge's Report and Recommendations [16] as to

these grounds, and these claims will be dismissed with prejudice.

2.    28 U.S.C. § 2254

The Court's de novo review of Anderson's habeas claims as to Grounds 1, 4, 5,

and 6 is governed by 28 U.S.C. § 2254, which provides that,

> [a]n application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent when it

applies a rule that contradicts that precedent or "confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000). "Under the 'unreasonable application' clause, a federal

habeas court may grant the writ if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." *Id.* at 413. To show an unreasonable

application, "a state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "[I]t is

not an unreasonable application of clearly established Federal law for a state court

to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quotation omitted).

Relief under § 2254 is limited to errors of federal law. *See* 28 U.S.C. § 2254(d); *Solis v. Dretke*, 107 F. App'x 414, 415 (5th Cir. 2004). Unless there is also a federal issue, errors in applying state law or in failing to follow the law of another state cannot justify habeas relief. *Solis*, 107 F. App'x at 415; *Garcia v. Director, TDCJ-CID*, 73 F. Supp. 2d 693, 750 (E.D. Tex. 2014). A federal court "do[es] not sit as a super state supreme court on a habeas corpus proceeding to review error under state law." *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983) (quotation omitted); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Wood*, 503 F.3d at 414 (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)).

B.    Ground 1: Ineffective assistance of trial counsel

Anderson asserts that his trial counsel was ineffective for failing to investigate and to offer evidence of his theory that the victim and her mother had fabricated the accusations against him in order to "blackmail" him for "money, property, and items" and to retaliate against him for "disciplining" the victim. Mem. [3] at 3-12. Anderson has submitted affidavits from Nancy Sessions and Kelly Sinclair who claim they would have testified that the victim and her mother wanted to get rid of him. Ex. [3-4] at 2; [3-10] at 4. The Magistrate Judge found that "Anderson's claim is without merit as the record reveals that trial counsel pursued

his theory" because his attorneys[3] questioned the veracity of the victim, inquired about the divorce, and asked Anderson himself about whether the victim, her mother, or the *Derouen* witnesses had any motivation to lie about him. R. & R. [16] at 11-13. Anderson objects to the Magistrate Judge's determination, arguing that these were isolated questions, that his counsel did not discuss blackmail or retaliation in his opening statement, and that they should have called the other witnesses. Obj. [18] at 1-2.

1.   The *Strickland* standard

Whether a convicted defendant's counsel was effective is governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient" by demonstrating that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Prejudice occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In making this decision, courts must consider the totality of the evidence presented to the jury. *Id.* at 695.

In determining whether counsel was deficient, a court must apply "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quotation omitted); *Pape v.*

---

[3] Anderson's defense team at trial consisted of two attorneys. *See, e.g.*, SCR [12-18] at 75; [12-21] at 20, 27.

*Thaler*, 645 F.3d 281, 292 (5th Cir. 2011) (noting a "strong presumption that counsel's challenged conduct was the product of reasoned trial strategy"). "[A]n attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, are virtually unchallengeable." *Pape*, 645 F.3d at 289 (quotation omitted). A petitioner cannot demonstrate deficient performance where his counsel made a conscious and informed decision "unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quoting *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006)).

Counsel's investigative choices are also accorded deference. *Strickland*, 466 U.S. at 690-91; *Soffar v. Dretke*, 368 F.3d 441, 473 (5th Cir. 2004). "The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be," *Soffar*, 368 F.3d at 473, and an attorney need not pursue cumulative or potentially fruitless avenues, *see Strickland*, 466 U.S. at 691; *Woodfox v. Cain*, 609 F.3d 774, 812 (5th Cir. 2010). So long as a defense counsel's investigation was reasonable in light of the known evidence, a petitioner's claim of deficient performance based on a failure to investigate must be denied. *Woodfox*, 609 F.3d at 806.

When evaluating an ineffective assistance of counsel claim under § 2254(d)(1), this Court's review is "doubly deferential." *Knowles*, 556 U.S. at 123. A petitioner's claim of ineffective assistance of counsel must be denied if "there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard."

*Harrington*, 562 U.S. at 105.

2.   Analysis

Anderson has failed to demonstrate that the state court acted unreasonably in rejecting his ineffective assistance of trial counsel claim because Anderson cannot satisfy either *Strickland* prong.

As to deficient performance, Anderson's attorneys clearly pursued his desired defense theory that the victim, her mother, and the *Derouen* witnesses were lying, and they presented possible motivations, though they may not have directly used the words "blackmail" or "retaliation." *See* SCR [12-18] at 108-110, 133; [12-19] at 11, 17-20, 22, 50-53, 56-57, 78-80, 83, 101-102, 133-34, 142-46; [12-20] at 24-26, 75, 80, 82-84, 89-92, 94, 109-11; [12-21] at 20-32. In light of the extensive evidence that was offered, the state court did not act contrary to, or unreasonably apply, federal law in rejecting Anderson's claim of ineffective assistance for failure to investigate or offer evidence of his preferred theory.

Starting with the opening statement, Anderson's counsel stated that the evidence would show that Susan sought to get rid of Anderson:

> And you'll see that during the course of the timeline, and as things happened, that Mr. Anderson and the victim's mother had split up. You will see that they start talking again, and you'll get to hear [Susan] testify that they were going to get back together. And we believe that the evidence will show that she wanted to be rid of Billy Anderson. And she took care of that.

SCR [12-18] at 109. On cross-examination of Susan, Anderson's counsel elicited testimony about this motivation:

> DEFENSE: You wanted [Anderson] away from your mom, didn't you?
> SUSAN: Yes, sir. He was very violent to her.

*Id.* at 133.

In cross-examining the lead investigator, Detective Pharez, Anderson's

counsel inquired about Ann's prior recantation of her claim that Anderson had

assaulted her:

> DEFENSE: Well, let me ask you about this: Did you talk to [Ann] about
> her recanting her story when she was younger?
> PHAREZ: We did discuss that, yes.
> DEFENSE: So, at one point in time there were some charges filed, and
> then she recanted; is that correct?
> PHAREZ: Yes.

Ex. [12-19] at 11. Defense counsel then questioned Pharez about inconsistencies

between Susan's and Caroline's statements about when Caroline first learned of

Anderson's actions:

> DEFENSE: Mr. Pharez, now when did Ms. Anderson tell you that she
> found out about these accusations?
> PHAREZ: She stated that she was told approximately one week prior to
> reporting it to me.
> DEFENSE: And that would have been when, sir?
> PHAREZ: One week prior to August 4, 2012.
> DEFENSE: So she told you one week -- she had knowledge of it for one
> week; is that correct?
> PHAREZ: Yes.
> DEFENSE: Now, during the course of your investigation, did you find
> that that was a false statement?
> PHAREZ: The forensic interview -- during the forensic interview, the
> victim stated that she had told her mother in the past before then; yes.
> DEFENSE: Did you ask Caroline Anderson about this?
> PHAREZ: I don't recall asking her why; no.
>                       *       *       *
> DEFENSE: Would you read the highlighted part, please.
>                       *       *       *
> PHAREZ: Ms. Anderson wrote that approximately one week ago,
> [Susan] came to her and confided that Billy Anderson, quote, had
> touched her where he wasn't supposed to. The mother asked [Susan]

why she had not told her about this earlier, and also if there had been
other incidents.

DEFENSE: So, basically, Mr. Pharez, there's two lies on this paper, isn't
there? One that she knew about it more than a week, and another one
where the mother asked [Susan] why she had not told her about this
earlier, when she knew, in fact, she knew about this stuff a year earlier. Do
you agree with that?

PHAREZ: That according to this report there is a discrepancy; no, I don't
agree. At the time of the initial report, that was the information I had,
was that the abuse was disclosed to the mother one week prior.

DEFENSE:  No, sir. That's not what I'm asking you. If that was a lie --
if you were being told a lie, how credible could this report be, based on
the information that she gave you?

PHAREZ: I strictly took her statement, what she told me at the time,
and recorded it.

DEFENSE: And you never asked her again about that statement,
whether it was one week or one year?

PHAREZ: I don't recall if I asked her about it or not.

DEFENSE: Do you think [Susan] was completely truthful with you
throughout this whole ordeal?

*Id.* at 17-20.

Through Pharez, trial counsel also introduced the defense's argument that

Susan used lies in order to get others in trouble. Specifically, defense counsel asked

Pharez about Susan's statement in her forensic interview:

DEFENSE: Now, you stated at the time, or I asked you a question that's
already been before the Court today, Your Honor, about [Susan] making
the statement that if I really wanted to get your daughter in trouble, I
would make a bigger lie than ever. Could you explain to the Court what
that conversation was about, if you know?

PHAREZ: I don't have any knowledge of her saying that.

DEFENSE: So you didn't look at the interview yesterday or last night
after we got out of court?

PHAREZ: I did, but I don't recall that part being in there.

DEFENSE: Well, it's on minute 6 at the 20th second on the first
interview of her.

*Id.* at 22. Counsel later played the relevant portion of the interview for the jury. *Id.*

at 78-80.

On cross-examination of Caroline, defense counsel asked her about Susan's

truthfulness:

> DEFENSE: Ms. Anderson, when [Susan] first told you that she abused
> by Billy, you didn't believe her, did you?
> CAROLINE: I can't say that I didn't believe her. I was in shock.
> DEFENSE: The fact is, ma'am, she has a history of lying, doesn't she?

*Id.* at 50. He also elicited testimony which disputed Susan's claim that she had

reported Anderson's actions earlier and effectively claimed that Susan had lied in

her forensic interview:

> DEFENSE: If someone made the statement that [Susan] told you one
> year ago about these allegations, before you went to the police, would
> that be a lie?
> CAROLINE: She didn't tell me one year before.
> DEFENSE: No, ma'am. I said if someone made that statement, would
> the statement itself be a lie?
> CAROLINE: Yes.

*Id.* at 57.

In cross-examining Ashley Ahern, the forensic interviewer who had spoken

with Susan about her allegations, Anderson's counsel pointed out that Susan had

claimed that she had told Caroline about Anderson's fondling a year earlier and

that she had commented on possible consequences for Anderson from her

accusations:

> DEFENSE: She did tell you that she told her mom about what happened
> approximately a year prior to this; is that correct?
> AHERN: Yes.
> DEFENSE: And she did state that she felt like Mr. Anderson could go
> to jail for this?
> AHERN: She did mention that in the end; yes.

*Id.* at 83.

On cross-examination of Sally, one of the *Derouen* witnesses, defense counsel

asked her directly about Anderson's theory of what motivated Sally's accusations:

> DEFENSE: And we talked about this the other day on the witness stand.
> I want to ask you again, after you've had time to reflect, is that the same
> incident that you threatened to tell that he touched you if he didn't give
> you money?
> SALLY: My answer was no, that's not true.
> DEFENSE: So did you leave a voice mail on his answering machine to
> that effect, that if he didn't give you money, you were going to tell that
> he touched you inappropriately?
> SALLY: No.

*Id.* at 101-102. Defense counsel likewise questioned Ann, the other *Derouen*

witness, about her prior recantation of her claims that Anderson had

inappropriately touched her:

> DEFENSE: Now, isn't it true that of all these incidents you talked about,
> you charged your father one time. Is that true?
> ANN: Yes.
> DEFENSE: And you were in a similar situation as you are today on
> those charges; right? You're on the stand, under oath, and you recanted
> those charges and said they didn't happen; isn't that correct?
> ANN: Yes.
>
>         \*     \*     \*
>
> DEFENSE: I'm asking you yes or no; you got on the stand, swore an oath
> to tell the truth, and took back everything you said and said it was not
> the truth. Isn't that true?
> ANN: Yes.

*Id.* at 133-34.

During the defense's direct examination of Virginia, one of Anderson's other

daughters, she offered testimony related to Anderson's theory of retaliation and

blackmail. *See generally id.* at 142-46. She stated that Anderson's relationship with

Susan "wasn't very good" because Susan "didn't want him telling her what to do."

*Id.* at 142. Virginia also testified that Sally had sought to blackmail Anderson:

> DEFENSE: [Sally] made some allegations against your father, and it's my understanding that you have some knowledge about a voice mail that she left?
> VIRGINIA: She lived with Daddy for a while and went to school over there during her teenage years. She wanted to go and, I don't know, she was going to school in Grand Bay, and there was some money when the drive-in sold that everybody was supposed to have got their part. Well, the way Daddy and Sharon set it up, or Daddy set it up, is you can't get it until you are of age. Well, Sharon was okay with her getting it, but Daddy had to sign to get it. She got mad at Daddy. There was some saying she was skipping school, teenage stuff that was not allowed. She went back home, and she called and left on Daddy's answering machine, if you don't give me my money, I'm going to tell everybody you touched my butt, plain as day.

*Id.* at 144.

Defense counsel also introduced testimony from Carol, another daughter of Anderson's, that Ann had said her earlier accusations were false:

> DEFENSE: Did you and [Ann] have any specific conversations about this accusation?
> CAROL: She just basically -- I asked her, I said, what happened, and she said that, you know, she lied about it. She told me she lied about it.
>          *       *       *
> DEFENSE: I'm asking about the specific conversation. What did [Ann] tell you about recanting her story?
> CAROL: She just told me that she lied about it, and that she was just mad because she wanted to go with me and she didn't want to be there anymore.

Ex. [12-20] at 24-26.

Anderson also claims that his "counsel didn't present his theory of blackmail and retaliation for filing a divorce," and the subsequent division of property. Obj. [18] at 1; Mem. [3] at 4. However, counsel did question Caroline about her divorce from Anderson:

DEFENSE: When did you and Billy divorce?
CAROLINE: The final divorce?
DEFENSE: Yes, ma'am.
CAROLINE: I believe that was 2013. August of 2013.
DEFENSE: And in that divorce, you were to give Billy certain property and some money; is that correct?
CAROLINE: Correct.
DEFENSE: And you hadn't done that, have you?
CAROLINE: I offered him the property. He wouldn't take it.
DEFENSE: No ma'am. Have you complied with the Order of the Court in your divorce?
CAROLINE: As much as I can, yes.

          *     *     *

DEFENSE: Ms. Anderson, I want to show you this document. Can you tell the Court what that is.
CAROLINE: Our Divorce Judgment.
DEFENSE: Can I see that, please. I want to flip over a few pages. And could you tell the Court what that heading is.
CAROLINE: Property Settlement Agreement.
DEFENSE: I want to flip to the next page over. Paragraph 2, have you complied with that?
CAROLINE: No, sir.

Ex. [12-19] at 51-53.

In addition to all of the foregoing testimony addressing the credibility of the State's witnesses and possible motivations of the accusers to lie, Anderson himself took the stand. He testified that Susan was "prone to lying," that she had been banned from going to certain people's homes, and that she would lash out if she did not get what she wanted. Ex. [12-20] at 75, 80, 82-84. Anderson also discussed Sally's motivation to lie:

DEFENSE: Now let me ask you about [Sally] made some allegations that you did that to her; that you improperly touched her?
ANDERSON: Yes. She said whenever she was staying with me when I got custody of her, that's when she made the allegations, and it's not true.
DEFENSE: Tell me about the threats she made to you for you to pay her money or she would say that that happened.

          *     *     *

22

ANDERSON: So, we go home, and Monday I'm in the drug store, and she calls telling me, if you don't sign this paper, I'm going to tell them that you touched my butt and all this stuff. And I was trying to tell her to shut up because I'm on the phone. Finally it just kept on and kept on, you know. I go home and she would be steady calling, wanting -- she wasn't coming back and all this kind of stuff. I was going to have to sign that paper or she would tell them I touched her butt. And me and her get into an argument on the phone, and finally I had to quit talking to her. She left it on the answering machine and then just finally it cooled down.

*Id.* at 89-92.

Anderson himself was twice asked if he knew why Susan, Sally, and Ann would make up allegations against him, and both times he answered that he did not know:

DEFENSE: From what you personally observed, do you have any idea why they would get up here and make these allegations against you?
ANDERSON: No, sir.

\*     \*     \*

STATE: Now, you said earlier, and I just want to make sure I'm clear, you have no idea why these girls would all be saying this, do you?
ANDERSON: No.

Ex. [12-20] at 94, 109-10. But on redirect, Anderson was again given the opportunity to assert his claims that Susan wanted to retaliate against him and that Sally had tried to blackmail him for money:

DEFENSE: The day [Susan] got so upset because she couldn't go to Jackson with you, she said, I will get you?
ANDERSON: Yes.
DEFENSE: Isn't that right?
ANDERSON: Yeah.
DEFENSE: Now, [Susan] lied a lot; right?
ANDERSON: Yes.
DEFENSE: But she wasn't lying about that, was she?
ANDERSON: Apparently not. We see that.
DEFENSE: You were asked some questions about [Sally] threatening you over money, to say that you had touched her?
ANDERSON: Yeah.

23

> DEFENSE: And that that money came through the Court; correct?
> ANDERSON: Yes, sir. It's where I went and had all the kids put on the drive-in, and if it was ever sold --
> DEFENSE: But you had to sign a paper or something -- or did you have to sign a paper to get that money?
> ANDERSON: Yes, sir. If they're under age, it has to be signed by the parents to get it early.
> DEFENSE: And that's what she was -- She said, if you don't go sign that paper, I'm going to tell people that you touched me?
> ANDERSON: Yes.

*Id.* at 110-11.

Finally, the defense's closing centered principally on the idea that Susan was lying in order to rid herself of Anderson. Ex. [12-21] at 21-23; *see also id.* at 30-32. Counsel further argued that Susan had discussed Anderson going to jail as a consequence of her allegations during her forensic interview, *id.* at 28-29, and that both of the *Derouen* witnesses had lied:

> If you recall, Virginia testified that she heard the recorded message that [Sally] left on Billy's answering machine, stating that if Billy didn't give [Sally] money, she was going to say that Billy touched her. Money, money, money.
>
> Carol Patton, Billy's other daughter. Carol testified that [Ann] told her that she lied when she made those allegations when she was 13 years old against Billy. She didn't say it was a made-up story. She said she lied. She lied. It's important, people. It's important.
>
> A lie is something that our Court's [sic] take seriously, and you should, too, if our system is going to work as designed. It's for a purpose.

*Id.* at 25; *see also id.* at 31.

This record makes clear that throughout the trial, defense counsel repeatedly raised Anderson's theory of defense, the issue of Susan's credibility as well as that of her mother and the *Derouen* witnesses, and discussed possible blackmail and retaliation as motivating the accusations. The above-cited excerpts amply show

24

counsel provided more than "a few weak questions" of truthfulness. *See* Obj. [18] at 1; SCR [12-18] at 108-110, 133; [12-19] at 11, 17-20, 22, 50-53, 56-57, 78-80, 83, 101-102, 133-34, 142-46; [12-20] at 24-26, 75, 80, 82-84, 89-92, 94, 109-11; [12-21] at 20-32. Based on this record, the Mississippi Supreme Court did not unreasonably apply the *Strickland* standard in determining that Anderson's trial counsel was not ineffective. While Anderson argues that his attorneys should have used the words "blackmail" and "retaliation" or been more explicit as to the role of the divorce in his theory, Obj. [18] at 1, he has not shown that his attorneys' decisions were anything other than "strategic choices" that "are virtually unchallengeable," *Pape*, 645 F.3d at 289.

Moreover, with the repeated statements about Susan wanting to "get [Anderson] in trouble" or "be rid of" him, *see* Ex. [12-18] at 108-110, 133; [12-20] at 110-11; [12-21] at 20-32, it was not unreasonable for the state court to determine that trial counsel was not deficient in investigating because the additional witnesses would have been cumulative, *Strickland*, 466 U.S. at 691; *Woodfox v. Cain*, 609 F.3d 774, 812 (5th Cir. 2010). Anderson has provided no evidence as to these witnesses' possible testimony other than that they would have testified that Susan wanted to get rid of him or that Sally left a message threatening Anderson on his answering machine. *See, e.g.*, Ex. [3-4] at 2; [3-10] at 2-3. This testimony was presented to the jury through other witnesses at trial, and such "cumulative testimony generally cannot be the basis of an ineffective assistance of counsel claim." *Richard v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009). Anderson's

"[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies," by choosing to rely on the testifying witnesses and Anderson himself to establish the theory that Susan had fabricated these allegations in order to "get him." *See Harrington*, 562 U.S. at 107.

Nor has Anderson demonstrated any prejudice from his attorneys' alleged deficient performance because he has not shown that any additional witnesses or greater emphasis on blackmail or retaliation would have led to a different result. *See Strickland*, 466 U.S. at 694-95. For nearly every witness at trial, Anderson's counsel asked about honesty and potential motivations to lie, and the jury nevertheless convicted him on all seven counts. Anderson has only offered speculation that more witnesses presenting the same testimony as to Susan wanting to "get rid of him" or further stressing "blackmail" or "retaliation" would have affected the outcome. *See* Mem. [3] at 5-6; Obj. [18] at 1-2. This is insufficient to demonstrate a reasonable likelihood that he would have been acquitted. *Strickland*, 466 U.S. at 694-95.

In sum, defense counsel presented Anderson's theory to the jury, who nevertheless convicted him on all counts. The Mississippi Supreme Court's rejection of his claim of ineffective assistance of trial counsel was not contrary to, or clearly unreasonable under, federal law. *Strickland*, 466 U.S. at 687, 694-95; 28 U.S.C. § 2254(d)(1). Anderson's objection as to this claim should be overruled.

C.    Ground Four: Failure to swear in the jury

In Ground Four, Anderson asserts that the "trial record does not show the jury being sworn" and that the failure to do so is a "structural error that requires automatic reversal" of his convictions. Mem. [3] at 26-27. The Mississippi Court of Appeals rejected this claim on direct appeal, finding that Anderson failed to provide sufficient evidence to overcome the presumption under Mississippi law that the oath was administered, because he relied solely "on the lack of the oath in the trial transcript and the fact that the trial transcript did reflect that each witness was duly sworn." *Anderson*, 293 So. 3d at 294. The Magistrate Judge likewise rejected Anderson's claim, noting that a federal court is bound by a state court's interpretation of state law. R. & R. [16] at 16-17. In his Objection [18], Anderson argues that this Court should not defer to the state court because he claims that the United States Constitution also requires a jury in a criminal trial to be sworn, citing to a case from the Illinois Supreme Court, *People v. Moon*, No. 125959, 2022 WL 1039689, at *11 (Ill. Apr. 7, 2022). Obj. [18] at 2-4.

1.    Anderson has not shown clear and convincing evidence that the jury was not sworn

The Mississippi Court of Appeals' finding that the jury was sworn is presumed correct unless Anderson can rebut it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009). Applying Mississippi law, which presumes that the jury was sworn, the Court of Appeals rejected Anderson's argument that the omission of the oath in the trial transcript established that the jury was not sworn. *Anderson*, 293 So. 3d at 294

(citing *Moore v. State*, 996 So. 2d 756, 761 (Miss. 2008); *Holbrook v. State*, 4 So. 3d 382, 383-85 (Miss. Ct. App. 2008); and *Woulard v. State*, 832 So. 2d 561, 567 (Miss. Ct. App. 2002)). In addition, the state court noted that

> [t]he record . . . reflects that Anderson's sentencing order specifically provides that the jury was 'duly sworn according to law.' Further, the jury instructions provided that '[w]hen you took your places in the jury box, *you made an oath* to follow and apply the instructions of the Court regarding the law,' and that '[r]egardless of an opinion you may have as to what the law ought to be, it would be a violation of *your sworn duty* to base a verdict upon any other view of the law than that given in these instructions by the Court.'

*Id.* (emphasis in original).

Anderson asserts that this finding was incorrect based on affidavits from his sister and three defense witnesses stating that they did not see the jury sworn. These affidavits were signed on September 24, 2019, or later, *see* Ex. [3-3] at 3-6, which postdates the decision of the Mississippi Court of Appeals, *see Anderson*, 293 So. 3d at 279 (decision dated September 10, 2019), although it does appear they were included in Anderson's state post-conviction petition, see SCR [12-2] at 24, 54-57. Despite his later presentation of these affidavits to the state court, they were not part of the record at the time that the Mississippi Court of Appeals adjudicated the merits of the unsworn jury claim, and therefore they cannot be considered by this Court. *See* 28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 182, 185 n.7 (stating that § 2254(d) "requires an examination of the state-court decision at the time it was made"); *Williams v. Houk*, 676 F. App'x 524, 538 (6th Cir. 2017) (applying *Pinholster* to not consider affidavits introduced in state post-conviction

proceedings that were not in evidence on direct appeal when the state court adjudicated the claim).

Even if the affidavits were considered, however, Anderson still lacks clear and convincing evidence that the Court of Appeals erred. The affidavits were created four years after Anderson's trial, while the contemporaneous evidence from the trial record supports a finding that the jury was sworn. As the Court of Appeals noted, unchallenged jury instructions[4] and the sentencing order referred to the jury oath. *Anderson*, 293 So. 3d at 294; SCR [12-7] at 144-45; [12-15] at 37-39; [12-20] at 121, 136-37. In addition, the State's closing also reflected that Anderson's jury had been sworn:

> I want to point out that you made an oath to follow and apply the instructions of the Court regarding the law. When you took your places sitting here as jurors, you raised your right hand and you took an oath, saying that I'm going to apply the law as given to me by the Court. Well, those jury instructions, those are the law. That is what you took an oath to follow.

SCR [12-21] at 6-7. In light of this evidence from the trial itself, Anderson's "affidavit[s], which w[ere] not executed until long after the trial, do[] not constitute clear and convincing evidence sufficient to rebut the presumption of correctness afforded to the state court's finding under § 2254(e)(1)." *Avila*, 560 F.3d at 307.

---

[4] Anderson argues that the jury instructions are not evidence that the jury was sworn because they were submitted before the jury was empaneled. Obj. [18] at 3. Anderson ignores that the jury instructions were not finalized until the charge conference, which happened after both the State and defense had rested. *See* SCR [12-20] at 120-35. Had the jury not been sworn, any party could have objected to including language in the instructions about the jury oath at that time, but the record lacks any evidence that the relevant instructions were ever challenged. *See generally id.*

2.    There is no established constitutional right to a sworn jury

Even if the Mississippi Court of Appeals' finding that the jury was sworn was unreasonable and rebutted by clear and convincing evidence, Anderson's claim for relief on this ground lacks merit because there is no clearly established federal law requiring that a jury be sworn in a criminal trial. *See, e.g.*, *United States v. Turrietta*, 696 F.3d 972, 981 (10th Cir. 2012) (leaving "unanswered" the question of whether the jury oath has "constitutional stature"); Kathleen M. Knudsen, *The Juror's Sacred Oath: Is There a Constitutional Right to a Properly Sworn Jury?*, 32 Touro L. Rev. 489, 490 (2016) ("Yet, despite its prevalence, practice, and significance, in over two hundred years the juror's oath has never been explicitly codified in the U.S. Constitution, federal statute, or in eight states . . . ."); Wayne R. LaFave et al., 6 Crim. Proc. § 22.3(f) (4th ed. Nov. 2022 Update) ("[T]he oath requirement is not expressed in [federal] court rule, statute, or Constitutional text."). "The simple fact is that 'habeas corpus is available only for the vindication of rights existing under federal law; not rights existing solely under the rules of state procedure.'" *Manning v. Warden, La. State Penitentiary*, 786 F.2d 710, 711 (5th Cir. 1986) (quoting *Nelson v. Estelle*, 642 F.2d 903, 905-06 (5th Cir. 1981)). Anderson is not entitled to relief under § 2254 unless he shows a violation of federal law. He has not done so.

In addition, Anderson's reliance on *Moon* is entirely misplaced. In *Moon*, the Illinois Supreme Court held that the Illinois state constitution, not the federal constitution, guaranteed the right to a sworn jury in a criminal trial. *Moon*, 2022

30

WL 1039689, at *11. The Illinois Supreme Court specifically noted that "the [United States] Supreme Court has not expressly stated that the jury oath is an essential element of a trial by an impartial jury." *Id.* The Mississippi Court of Appeals' decision to apply its own state law, rather than following the approach of a different state, does not entitle Anderson to relief. *Solis*, 107 F. App'x at 415; *Garcia*, 73 F. Supp. 2d at 750; *see also Knowles*, 556 U.S. at 122 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (quotation omitted)).

Anderson alternatively argues that the right to a sworn jury is encompassed in the Double Jeopardy Clause of the Fifth Amendment because it is well-established that "jeopardy attaches when the jury is empaneled and sworn." Mem. [3] at 27; *Martinez v. Illinois*, 572 U.S. 833, 839 (2014) (quoting *Crist v. Bretz*, 437 U.S. 28, 35 (1978)). "The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). The State has not sought to prosecute Anderson again for his offenses of conviction, and he did not receive multiple punishments for the same offense. As such, he has not shown a violation of the Double Jeopardy Clause.

To the extent he claims that the failure to swear in the jury could permit the State of Mississippi to try him again for the same offenses of conviction and that

doing so would violate his constitutional rights, this issue is speculative in the absence of any evidence that the State will seek to do so. Moreover, the principle that jeopardy attaches when the jury is sworn establishes that the defendant is in jeopardy once he is put to trial even when the "prosecution d[oes] not culminate in a conviction or an acquittal." *Crist*, 437 U.S. at 34. Anderson's trial ended in seven convictions; he was unquestionably put to trial for the offenses at issue. *See id.* at 33-35 (noting the expansion of the Double Jeopardy Clause beyond merely providing that jeopardy attaches "when there has been a conviction or an acquittal"); *Martinez*, 572 U.S. at 839. Anderson has not shown that a federal constitutional right was implicated by any failure to swear in the jury.

3.   <u>Anderson has not shown that any failure to swear in the jury made his trial fundamentally unfair</u>

A violation of state procedure can only justify relief if it would render the trial as a whole to be fundamentally unfair, *Manning*, 786 F.2d at 711-12, and Anderson has made no such showing. He provides no evidence that the jury acted arbitrarily or that he would have been acquitted. *See* Mem. [3] at 26-29; Obj. [18] at 2-3. As the Court has discussed, the jury was reminded multiple times of the principles and importance of the oath, even if it was not administered. *See Anderson*, 293 So. 3d at 294; SCR [12-20] at 136-37; [12-21] at 6-7. Under these circumstances, Anderson lacks any evidence that his trial was fundamentally unfair, and his objection as to this ground should be overruled. *Manning*, 786 F.2d at 711-12.

D.    Ground Five: Witness sequestration

Ground Five asserts that the "trial court abused its discretion in not calling a mistrial after the sequester rule was invoked where the prosecutor complained of [sic] state and defense witnesses were texting each other about what was transpiring in and out of trial." Mem. [3] at 30. The Mississippi Court of Appeals denied this claim, finding "no abuse of discretion in the way the trial court handled the situation by firmly reminding counsel to re-explain to their witnesses their obligations under the sequestration rule and to warn counsel that further violations would result in sanctions." *Anderson*, 293 So. 3d at 296. It further noted that the record lacked evidence that any violation of the rule affected any trial testimony. *Id.* at 295-96. The Magistrate Judge found Anderson's claim asserted only a violation of a state evidentiary rule, not a constitutional violation. R. & R. [16] at 17-18. Anderson objects to this determination, stating that sequestration is a due process right and that his trial was fundamentally unfair. Obj. [18] at 4-5. This argument is without merit.

"[A] trial court's failure to sequester witnesses does not amount to the deprivation of a constitutional right and therefore cannot form the basis of federal habeas relief." *Pollard v. Cain*, No. 06-1493, 2007 WL 4299991, at *15 (W.D. La. Nov. 9, 2007)) (emphasis removed) (collecting cases); *accord Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. Unit A 1981). Anderson claims that the trial court violated Mississippi Rule of Evidence 615, but this Court is bound by the state court's rejection of this state law claim, *see Anderson*, 293 So. 3d at 295-96; *Wood*,

503 F.3d at 414, and even if it did violate a state evidentiary rule, that does not implicate a federal constitutional issue cognizable in habeas, *Passman*, 652 F.2d at 569; *Manning*, 786 F.2d at 711.

Moreover, Anderson has not shown that any violation made his trial fundamentally unfair. *See Manning*, 786 F.2d at 711-12. The trial judge admonished the attorneys to remind their witnesses of the sequestration order and warned of sanctions:

> I understand there's some concern about witnesses going up and down out there and looking in the courtroom when witnesses are testifying. Make sure you tell your witnesses under oath and under the rule, that they're to stay where they're supposed to be, and they don't need to be walking up and down finding out who is testifying. I'm not going to have it. If they do it, one of the sanctions is they don't testify, so make sure you spread that word.

SCR [12-19] at 63-64. In addition, the principal violation reflected in the record occurred when several defense witnesses were badgering Ann, a prosecution witness, about her testimony. *Id.* at 65-66. The trial court again reprimanded the parties:

> STATE: We just got this text message from [Sally] who testified at the *Derouen*, and it says Virginia, Carol and Shay -- Shay is a witness that [sic] was identified by the Defense. We've not had an opportunity to speak to her -- keep talking to my sister, being [Ann], about the case, trying to tell her nothing has happened. Can you keep them away from us. We would ask the Court's guidance and assistance in that.
> THE COURT: Wasn't that my first housekeeping thing, after the attorneys and everybody be here?
> DEFENSE: Yes, sir.
> THE COURT: The rule being invoked, means it's invoked, and that means nobody better be talking to anybody. I'm going to start sanctioning people on both sides.
> STATE: Your Honor, can we give [defense counsel] the opportunity to let his witnesses know that they're not to contact --
> THE COURT: I'll say it again. I want them told.

*Id.*

As for Anderson's claim that witnesses were using their phones and recording testimony from the trial, this too was addressed by the trial judge who viewed the witness's phone himself and found there was no merit to this allegation:

> THE COURT: [Ann], you were put under oath early this morning. Have you been recording anything in this courtroom in any shape or form? And you're still under oath, and I'm serious about this.
> ANN: No, sir.
> THE COURT: Have you recorded anything on that phone or taken any pictures?
> ANN: My sister was next to me. I turned it off. I promise, it was off.
> THE COURT: Because if you're lying to me and I find out later --
> ANN: I can show you my recording session.
> THE COURT: You don't mind if we look at it?
> ANN: I can show you --
> THE COURT: Please look at it. [Bailiff], you go out that door and you get those women down the stairs right now, every blessed one of them. I am tired of this. Get them out of here, down the stairs, right now.
> CLERK: I don't think you understood him.
> THE COURT: Ladies, down the stairs now. Down the stairs now.
> STATE: Judge, these are the photos on her phone, and there is one recording.
> ANN: You can play it. I don't know what it is, but go ahead.
> STATE: It was obviously not in this courtroom.
> ANN: My little girl, it's her birthday. It's a little piano thing and she can hook her I-pad to it and it lights up and it changes, so I sent that to my husband to show him.
> THE COURT: Okay. Thank you. I think we've seen that there's much to-do about nothing. Thank you very much, ma'am. You have a good evening.
> STATE: We'll tell all of our people to put their phones away.
> THE COURT: Absolutely. Everybody do that so we don't have that yay-yaying.

SCR [12-20] at 17-19.

This record demonstrates that the trial judge repeatedly addressed the witness sequestration issues each time they were brought to his attention and instructed the parties to tell their witnesses to comply. SCR [12-19] at 63-66; [12-20]

at 17-19. Anderson has pointed to no evidence that any violation resulted in inaccurate, false, or tailored testimony. Mem. [3] at 21 (speculating without any support that the witnesses may have changed their testimony); *see generally* Obj. [18]. Without any proof that any noncompliance with the sequestration rule impacted the trial, Anderson cannot show that his trial was fundamentally unfair, or that the Mississippi Court of Appeals' rejection of his claim was contrary to or an unreasonable application of clearly established federal law. *See Manning*, 786 F.2d at 711-12; 28 U.S.C. § 2254(d). This objection should also be overruled.

E.    Ground Six: Sentencing

Finally, Anderson argues that his sentences violated the Eighth Amendment's prohibition on "cruel and unusual punishment" and his due process rights because the trial court sentenced him to the statutory maximum and ran the sentences consecutively. Mem. [3] at 34-35; Obj. [18] at 5-6. Anderson claims that his sentences were increased based on the *Derouen* witnesses' testimony of sexual abuse, for which he was not convicted. Obj. [18] at 6.

The Mississippi Court of Appeals rejected this claim, stating that the trial court enjoys broad discretion in sentencing and could consider the trial testimony, that the sentences were within the statutory limits, and that the trial court recognized that he had no other criminal convictions. *Anderson*, 293 So. 3d at 296-97. The Report and Recommendations [16] found that Anderson did not show that his sentences were grossly disproportionate to his conviction or that the trial judge acted arbitrarily and capriciously. R. & R. [16] at 19. In his Objection [18], Anderson

argues that he is raising a challenge under the "cruel and unusual clause," not a proportionality challenge, and claims that the trial court's statements at sentencing suggest that he was sentenced "<u>only</u>" for the uncharged crimes. Obj. [18] at 6 (emphasis in original).

1.   <u>Anderson's "cruel and unusual" claim</u>

As to Anderson's contention that the "cruel and unusual" clause is distinct from a disproportionality challenge, he is mistaken. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The "cruel and unusual" clause prohibits both "barbaric punishments" and "sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983). Term of years sentences are not "barbaric punishments," and therefore an Eighth Amendment challenge to such sentences is solely addressed through the proportionality analysis of the "cruel and unusual clause." *See United States v. Ayetolan*, 917 F.3d 394, 407 (5th Cir. 2019); *Solem*, 463 U.S. at 287. Under this test, Anderson can only demonstrate that the imposition of seven consecutive fifteen-year sentences was "cruel and unusual" if he shows that this is an "extraordinary case[]" where his sentences are "grossly disproportionate" to the crimes of conviction. *See Ayetolan*, 917 F.3d at 407 (quoting *McGruder v. Puckett*, 954 F.2d 313, 315 (5th Cir. 1992)); *Ewing v. California*, 538 U.S. 11, 30 (2003); *Solem*, 463 U.S. at 287.

"[S]ucessful Eighth Amendment challenges to prison-term lengths [are] rare." *United States v. Looney*, 532 F.3d 392, 396 (5th Cir. 2008) (upholding a 548-month sentence for a nonviolent offense even though the defendant had no previous convictions). A harsh or effective life sentence is an insufficient basis to show an Eighth Amendment violation. *United States v. Gray*, 455 F. App'x 448, 450 (5th Cir. 2011). Anderson received a fifteen-year sentence for each of his seven convictions for touching a child for lustful purposes. In light of Supreme Court precedent upholding a mandatory life without parole sentence for possessing 672 grams of cocaine, *Harmelin v. Michigan*, 501 U.S. 957, 961, 996 (1991), and a forty-year sentence for possessing less than nine ounces of marijuana, *Hutto v. Davis*, 454 U.S. 370, 371 (1982), Anderson has provided no basis to conclude that the Mississippi Court of Appeals acted contrary to, or that it unreasonably applied, clearly-established federal law in rejecting his claim that his sentences are "cruel and unusual." Anderson's disagreement with his sentences fails to show that they were "grossly disproportionate" to his crimes. *See Looney*, 532 F.3d at 396-97; *Ayetolan*, 917 F.3d at 407.

2.    Consideration of uncharged conduct

Anderson also claims that his constitutional rights were violated because the sentencing judge considered the *Derouen* witnesses' testimony in determining his sentences. Obj. [18] at 6. He asserts that he was sentenced "only for these [uncharged] crimes" rather than for the offenses of conviction, and that he would not have received the statutory maximums or consecutive sentences if the

sentencing judge had considered only his offenses of conviction. *Id.* (emphasis in original).

At sentencing, the trial judge referred to "generational" damage and conduct not resulting in a conviction:

> The Court has heard all the testimony, as has [sic] my co-judges, the folks to my right, the finders of fact, and it is apparent that the damage done is generational. And I don't know that we, as human beings, and as flawed and failed as we are, that our system ever has a remedy for those types of damages.
>
> I understand, [defense counsel], that he has not ever been convicted of a crime, but there are things that go on in lives and families that although there's not a conviction, there is irreparable harm and damage that resounds through the ages and through generations. Because of the nature and gravity of what's before me, I'm going to give you the maximum of 15 years on each count, to run consecutive, and a $500 fine on each count.

SCR [12-21] at 52-53. In addition, the sentencing court stated that it had distinguished between the conduct for which Anderson was tried and the testimony of the other victims. *Id.* at 52.

Anderson's claim that the trial court violated his constitutional rights in considering the testimony of the *Derouen* witnesses in sentencing him is without merit. Considering a defendant's character or other conduct in sentencing "does not result in 'punishment' for any offense other than the one of which the defendant was convicted." *United States v. Watts*, 519 U.S. 148, 155 (1997) (quoting *Witte v. United States*, 515 U.S. 389, 401 (1995)). "[T]here is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct." *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). As a result, to the extent that the trial court

considered criminal conduct that did not result in a conviction in sentencing Anderson, this did not violate the Constitution and cannot provide a basis for habeas relief. *Brown*, 419 F.3d at 376; *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996); *see also Watts*, 519 U.S. at 157 (holding that an "acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge"). This objection should be overruled.[5]

### III. CONCLUSION

To the extent the Court has not specifically addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result. After a de novo review of the record, the Court concludes that the Objection [18] to the Magistrate Judge's Report and Recommendations [16] should be overruled and that the Report and Recommendations [16] should be adopted as the opinion of this Court.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Petitioner Billy Carol Anderson, Sr.'s Objection [18] to the Magistrate Judge's Report and Recommendations [16] is **OVERRULED**.

---

[5] Anderson also appears to make an *Apprendi* challenge, claiming that his sentences were increased by "judicial determination" of uncharged crimes. Obj. [18] at 6; *see* Mem. [3] at 35 (citing *United States v. Booker*, 543 U.S. 220, 231 (2005)); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi* and its progeny establish a "defendant's right to have the jury find the existence of 'any particular fact' that the law makes essential to his punishment," *Booker*, 543 U.S. at 232; *Apprendi*, 530 U.S. at 488, 490, and are implicated only when a judge seeks to impose a sentence beyond the maximum sentence authorized by the jury verdict, *Booker*, 543 U.S. at 232. That case law is inapplicable here because Anderson's convictions authorized a fifteen-year sentence on each count, without requiring any additional facts to be found. By returning the guilty verdicts, Anderson's jury found all of the facts necessary to support his seven consecutive fifteen-year sentences beyond a reasonable doubt.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Report and Recommendations [16] entered by United States Magistrate Judge Michael T. Parker, in this case on February 8, 2023, is **ADOPTED** in its entirety as the finding of this Court.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Petitioner Billy Carol Anderson, Sr.'s Petition [1] under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a person in state custody is **DISMISSED WITH PREJUDICE**. The Court will enter a separate Final Judgment in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 14th day of June, 2023.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE